AO 91 (Rev. 02/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| GIUSEPPE PENZATO and KESIA PENZATO | ) ) ) | Case No. 3 11 70696 |
| Defendant | | |

EDL

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of 11/20/2009 in the county of San Francisco in the Northern District of California, the defendant violated 18 U.S.C. § 1589(a) and 1592(a), an offense described as follows:

Giuseppe Penzato: 18 USC 1589(a) Forced Labor and 18 USC 1592(a) Unlawful Conduct With Respect to Documents in Furtherance of Forced Labor

Kesia Penzato: 18 USC 1589(a) Forced Labor

FILED

JUN 2 4 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

This criminal complaint is based on these facts:

See attached declaration of ICE Special Agent Melissa Saurwein.

☑ Continued on the attached sheet.

APPROVED AS TO FORM
OWEN MARTIKAN, AUSA

_____
Complainant's signature

Special Agent Melissa Saurwein, ICE/HSI
Printed name and title

Sworn to before me and signed in my presence.

Date: June 23, 2011

_____
Judge's signature

City and state: San Francisco, California

Hon. Elizabeth D. Laporte, US Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Melissa E. Saurwein, being duly sworn, hereby depose and state as follows:

### I. INTRODUCTION AND PURPOSE FOR THE AFFIDAVIT

1. This affidavit is submitted in support of arrest warrants for Giuseppe PENZATO and Kesia PENZATO, for violating Title 18, United States Code Section 1589, Forced Labor, and for Giuseppe PENZATO for violating Title 18, United States Code Section 1592, Unlawful Conduct With Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor, as described in this affidavit. The statements contained in this affidavit are based on my own investigation, my training and experience as a law enforcement agent, on information provided to me by other law enforcement agents, investigators and individuals with knowledge of this matter, and on information that I have obtained through my review of documents. This affidavit summarizes such information but does not purport to set forth all of the evidence gathered to date in this investigation.

### II. AGENT BACKGROUND

2. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and am currently assigned to the Office of the Special Agent-in-Charge, San Francisco, Human Smuggling and Trafficking Group. I have been employed by HSI as a Special Agent since October, 2009. Before joining HSI, I was employed as an Officer with Customs and Border Protection, where I worked from December, 2003, through October, 2009.

1

3.     In my capacity as a Special Agent, I have attended and completed a twelve-week Criminal Investigator Training Program, and a twelve-week U.S. Immigration and Customs Enforcement Special Agent Training Program at the Federal Law Enforcement Training Center (FLETC) located in Glynco, Georgia. While attending FLETC, I received training in conducting immigration, financial, strategic, narcotics, human trafficking, human smuggling, and fraud investigations. I received training in asset forfeiture, undercover operations, and physical and electronic surveillance operations.

4.     In performing my duties as a Special Agent, I have written reports of investigation; interviewed suspects; participated in the execution of search and seizure warrants and arrest warrants; conducted physical surveillance; arrested violators of federal law, and obtained and analyzed telephone tolls, public source records, official immigration documents, financial records, notes, and ledgers. I have also interviewed cooperating defendants and witnesses, and debriefed cooperating informants about the ways in which people are trafficked into the United States and kept here in violation of federal law.

5.     I have investigated violations of the following federal statutes: 18 U.S.C. § 371 Conspiracy (in the context of harboring aliens or inducing aliens to enter the United States); 8 U.S.C. § 1324 Bringing in and Harboring Certain Aliens; 18 U.S.C. § 1546 Fraud and Misuse of Visas, Permits, and Other Documents; 18 U.S.C. § 1584 Involuntary Servitude; 18 U.S.C. §§ 1589-92 Forced Labor and Human Trafficking; and 18 U.S.C. § 1581 Peonage.

### III. APPLICABLE CRIMINAL STATUTES

6. Under Title 18, United States Code, Section § 1589(a), it is a crime for anyone to knowingly provide or obtain the labor or services of a person by any one of the following means:

   (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

   (2) by means of serious harm or threats of serious harm to that person or another person;

   (3) by means of the abuse or threatened abuse of law or legal process; or

   (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

7. Under Title 18, United States Code, Section 1592, it is a crime to knowingly destroy, conceal, remove, confiscate, or possess any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person, in the course of a violation of 18 U.S.C. § 1589, or with the intent to violate 18 U.S.C. § 1589, or to prevent or restrict – or to attempt to prevent or restrict – without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons.

### IV. DEFINITIONS

8. The phrase "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another

3

person to cause that person to take some action or refrain from taking some action. 18 U.S.C. § 1589(c)(1).

9. The phrase "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

## V. BACKGROUND OF THE CRIMINAL INVESTIGATION

10. This investigation began in May, 2010, when I and other federal law enforcement officers learned of allegations that Kesia and Giuseppe PENZATO, who reside in San Francisco, California, had kept a Brazilian national named ▮▮▮▮▮▮▮▮▮ in their home while exploiting her to obtain her services as a domestic servant. Upon learning of this allegation, we interviewed ▮▮▮▮▮▮▮ and other individuals in San Francisco who had relevant information. I have also reviewed pertinent documents, such as Customs and Border Protection travel records; California Department of Motor Vehicle records; police reports; airline records; Department of State visa application records; and law enforcement databases.

11. Based upon all of the information that I have learned during my investigation, I have probable cause to believe that Kesia and Giuseppe PENZATO enticed ▮▮▮▮▮▮▮ to come to the United States, and then used force and threats of force to coerce ▮▮▮▮▮▮▮ to work for them in their home in San Francisco as a domestic servant from on or about August 25, 2009, through on or about November 20, 2009. This affidavit does not include all facts known to the government as a result of this investigation, but rather just those facts that are necessary to

4

establish probable cause to believe that Kesia and Giuseppe PENZATO committed the crimes of forced labor and unlawful conduct with respect to documents in furtherance of forced labor.

12. The Trafficking Victims Protection Act provides that victims of severe forms of trafficking in persons, who are aliens and potential witnesses to such trafficking, may be allowed to remain temporarily in the United States to effectuate prosecution of those responsible for the trafficking. This temporary status in the United States is known as Continued Presence. Continued Presence allows the recipient to obtain work authorization and Health & Human Services benefits. Continued Presence does not convey permanent status in the United States, though individuals in Continued Presence often apply for and receive T-Visas, which allow them to remain legally in the United States for a period of three years and to apply thereafter for permanent legal residency. Continued Presence can be revoked at the discretion of ICE if evidence should be obtained that the alien who has been certified for Continued Presence is not a victim of a severe form of trafficking. A Continued Presence application has been filed and approved along with an application for an employment authorization card for ▆▆▆▆▆▆.

## VI. FACTS SUPPORTING PROBABLE CAUSE

### A. ▆▆▆▆▆▆ is Offered Employment in the United States.

13. ▆▆▆▆▆▆ is a ▆▆-year-old Portuguese speaking native and citizen of Brazil. ▆▆▆▆▆▆ grew up poor in a small village in the state of Sao Paulo, Brazil, and had no formal education until she was 10 years old. She attended school through the 8th grade. ▆▆▆▆▆▆ and Kesia PENZATO were friends as adolescents in Brazil, until Kesia PENZATO moved away and they lost touch. In 2008, Kesia PENZATO contacted ▆▆▆▆▆▆ through a social networking website, and they began to communicate online. At the time, Kesia PENZATO lived in San Francisco, California, and was married to Giuseppe PENZATO, who

5

was an employee of the Italian Consulate in San Francisco. Kesia PENZATO urged ▓▓▓ ▓▓▓▓▓ to come and work for them in San Francisco, and told ▓▓▓▓▓▓▓ that she could make a better future for herself and her son by attending nursing school in San Francisco. Kesia PENZATO told ▓▓▓▓▓▓▓ that she was making the offer out of friendship, and that her husband would obtain a visa for ▓▓▓▓▓▓▓.

14. By December, 2008, ▓▓▓▓▓▓▓ began to seriously consider the PENZATO's offer, because the government contract under which she was working as a community public health agent in Brazil was about to end, and her future employment was uncertain. In January, 2009, ▓▓▓▓▓▓▓ told Kesia PENZATO that she would come to the United States to work for the PENZATOs.

15. On or about January 29, 2009, Giuseppe PENZATO emailed ▓▓▓▓▓▓▓ a contract governing her employment for them in the United States. According to the contract, the PENZATOs would pay ▓▓▓▓▓▓▓ $1,500 per month in twice-monthly installments of $750 for 35 hours per week of housekeeping and child care services, with Saturdays and Sundays off (unless some of the 35 hours of work were performed on a Saturday), and promised not to require ▓▓▓▓▓▓▓ to stay in their home other than during regular working hours. The contract promised to provide ▓▓▓▓▓▓▓ with free living quarters at their home, promised that the PENZATOs would never withhold ▓▓▓▓▓▓▓'s passport, official documents, or personal property for any reason, and promised to pay ▓▓▓▓▓▓▓'s airfare to the United States at the beginning of her employment, and to pay ▓▓▓▓▓▓▓'s airfare back to Brazil or onward to another country at the end of her employment assignment. ▓▓▓▓▓▓▓ and Giuseppe PENZATO both signed this contract, which was dated June 1, 2009. Kesia PENZATO had also promised ▓▓▓▓▓▓▓ that she would have the means and time while working for the

6

PENZATOs to attend school and become a nurse, and that she would be able to seek housekeeping work from other employers in the United States.

16. In approximately April, 2009, ▮▮▮▮ was interviewed at the U.S. Consulate in Brazil for her A3 domestic servant visa application. The PENZATOs had told ▮▮▮▮ ▮▮▮▮ tell the consular officer that she had previously worked for Kesia PENZATO's mother in Brazil and that the PENZATOs wanted her to come to the United States because their children had already become attached to her. This was not true, but ▮▮▮▮ said what the PENZATOs had told her to say so that she could obtain the visa. The visa application was initially denied, but later approved after Giuseppe PENZATO told ▮▮▮▮ that he had pulled some strings to get the application approved.

17. ▮▮▮▮ received her A3 visa in June, 2009. Two months later, after her employment contract as a public health worker in Brazil had ended, ▮▮▮▮ sold all her belongings, left her son in the custody of her estranged husband, and moved to the United States to work for the PENZATOs and, she hoped, to make a better life for herself and her son.

B. ▮▮▮▮ **Works for the PENZATO Family.**

18. ▮▮▮▮ left Brazil with the PENZATO family on August 24, 2009, and passed through U.S. Customs in Houston, Texas. Giuseppe PENZATO took possession of ▮▮▮▮ ▮▮▮▮'s passport in Houston, after telling her that he would keep it safe because the United States was a dangerous place, where someone might rob her and take it. ▮▮▮▮ trusted Giuseppe PENZATO. ▮▮▮▮ and the PENZATOs then took a connecting flight to San Francisco, where they arrived on August 25, 2009.

19. When they arrived in San Francisco, the PENZATOs made ▓▓▓▓ share a room with their five-year-old daughter. Approximately three days after she arrived, Kesia PENZATO told ▓▓▓▓ that she was in their home to work, not to sleep all day, and that she would begin work at 6:30 every morning. ▓▓▓▓ typically worked from 6:30 in the morning until 9:00 at night, and was forced to work on Saturdays and Sundays. She typically worked 60 or more hours per week, rather than the 35 hours per week promised in her employment contract.

20. ▓▓▓▓ was not paid for any of her work until late September or early October, 2009, when Giuseppe PENZATO gave her $700, of which he said $500 was her salary and $200 was a loan that she would have to pay back to him. When ▓▓▓▓ asked Kesia PENZATO why she was not being paid the $1,500 per month that she had been promised, Kesia PENZATO told her that she was still being "trained" and was not yet entitled to be paid in full.

21. After ▓▓▓▓ had spent about one week in the PENZATO's home, the PENZATOs took away her key, and no longer allowed her to have a key to their home. Kesia PENZATO controlled when ▓▓▓▓ could come and go from their home.

22. Kesia PENZATO withheld food from ▓▓▓▓ while she worked in the PENZATO's home. During the work week, Kesia PENZATO allowed ▓▓▓▓ to have a cup of milk in the morning, occasionally with some crackers, and no other food for the rest of the day. On weekends, Kesia PENZATO would allow ▓▓▓▓ to eat other meals if the PENZATO's children were present, but if ▓▓▓▓ missed a meal with the children, then Kesia PENZATO would dispose of any leftovers before ▓▓▓▓ could eat them.

23. Beginning in late September, 2009, Giuseppe PENZATO arranged for ▆▆▆ ▆▆▆▆ to do additional work at the home of Marcello Curci, the vice consul at the Italian Consulate, at the rate of $18 per hour. Curci paid Giuseppe PENZATO for ▆▆▆▆'s work, not ▆▆▆▆.

24. In late October, 2009, Giuseppe PENZATO made a check out to ▆▆▆▆ for $600, but then took her to the bank and made her cash the check and give him back money out of the check that he said she owed them.

25. During ▆▆▆▆'s employment with the PENZATO family, Giuseppe PENZATO possessed and controlled ▆▆▆▆'s passport. On at least one occasion, ▆▆▆▆ requested the passport from Giuseppe PENZATO and he refused to return the passport to her. The passport remained in Giuseppe PENZATO's custody until shortly before she left the PENZATO home.

26. Kesia and Giuseppe PENZATO often told ▆▆▆▆ that because they were diplomats, the laws of the United States did not apply to them. Curci also told ▆▆▆▆ that she had no recourse against the PENZATOs because they were immune from criminal prosecution.

27. On or around October 24, 2009, ▆▆▆▆ complained to Kesia and Giuseppe PENZATO about the breaches of their employment agreement and about her working conditions. The PENZATOs then drafted a second contract for ▆▆▆▆ to sign. ▆▆▆▆ refused to sign the contract. Kesia PENZATO physically attacked ▆▆▆▆ pushing and striking ▆▆▆▆ until she would sign the contract. Kesia PENZATO grabbed ▆▆▆▆'s head and hand and physically pushed her toward the contract,

eventually forcing her to sign it. ▆▆▆▆▆ was never provided with a copy of the second contract.

28. Kesia PENZATO berated ▆▆▆▆▆ telling her that she was born to be a servant, that she was a prostitute, that she was ugly, and that even her birth mother did not want her. ▆▆▆▆▆ was frightened of Kesia PENZATO, and of being physically assaulted by her.

29. In late October, 2009, Giuseppe PENZATO began to sexually assault ▆▆▆▆▆ at night. He would enter the room that ▆▆▆▆▆ shared with his five-year-old daughter, and run his hand over her body, buttocks, breasts, and face, for several minutes at a time. ▆▆▆▆▆ was so scared and shocked that she pretended to be asleep.

30. In November, 2009, ▆▆▆▆▆ received no pay from the PENZATOs. ▆▆▆▆▆ felt trapped and fearful. On one occasion in mid-November, 2009, ▆▆▆▆▆ asked Giuseppe PENZATO to return her passport, as she had done before without any success. This time, Giuseppe PENZATO threw ▆▆▆▆▆'s passport at her and taunted her to figure out her rights. Later, Giuseppe PENZATO demanded that ▆▆▆▆▆ return her passport to him, but she refused.

31. In mid-November, 2009, ▆▆▆▆▆ told the PENZATOs that she was leaving her employment with them. Giuseppe PENZATO presented ▆▆▆▆▆ with a handwritten accounting of the money she owed them for her airfare from Brazil and cellular phone bills, which he claimed totaled $696.49. While Giuseppe PENZATO watched, Kesia PENZATO slapped ▆▆▆▆▆ in the face, pulled her hair, squeezed her throat, and grabbed her shirt and shook her. ▆▆▆▆▆ was too scared to defend herself. When ▆▆▆▆▆ threatened to call the police, the beating stopped and the PENZATOs told ▆▆▆▆▆ that

she had until morning to leave the house. Because the PENZATOs had hidden ▮▮▮▮'s suitcase, she was forced to leave their home with her belongings in a garbage bag.

32. Between November 30, 2009, and on or about December 20, 2009, ▮▮▮▮ lived and worked at the home of Marcello Curci, the Italian vice consul. On several occasions, Curci told ▮▮▮▮ that she had no recourse against the PENZATOs because they had diplomatic immunity. While ▮▮▮▮ stayed with the Curci family, Kesia PENZATO repeatedly called and emailed ▮▮▮▮ berating and insulting her. Kesia PENZATO also called and sent messages to ▮▮▮▮'s relatives and others who knew her in her home village in Brazil, telling them that ▮▮▮▮ had become a prostitute.

33. Based on consultation – through the Office of the United States Attorney – with the United States Department of State and their review of the relevant treaty, I have determined that Giuseppe and Kesia PENZATO do not have consular immunity from prosecution for the allegations set forth in this affidavit.

### VII. CONCLUSION AND SEALING REQUEST

34. Based on all of the facts and circumstances described in this affidavit, and based on my training, experience, and consultations with others, there is probable cause to believe that Giuseppe PENZATO and Kesia PENZATO have violated 18 U.S.C. § 1589 Forced Labor, and that Giuseppe PENZATO has violated 18 U.S.C. § 1592 Unlawful Conduct With Respect to Documents in Furtherance of Forced Labor. I respectfully request the issuance of arrest warrants for Giuseppe PENZATO and Kesia PENZATO for these crimes.

35. This investigation is ongoing and the subjects of the investigation are not aware that they are being investigated. Moreover, they are foreign nationals who are in the United States for a temporary job assignment. If they were to discover that they were the subjects of a

criminal investigation, based on my training and experience I believe that they are likely to flee the country. Therefore, I request that the Court seal the complaint, this affidavit, the sealing application, and the arrest warrant until further order of the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, according to the laws of the United States of America.

Executed on this 23 day of June, 2011, in San Francisco, California.

*Melissa Saurwein*
Special Agent Melissa E. Saurwein
Immigration and Customs Enforcement

Sworn and subscribed before me on June 23, 2011.

HON. ELIZABETH D. LAPORTE
United States Magistrate Judge